**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

MRS. DOE, MR. DOE, JOHN DOE,　　　　)
　　*Plaintiffs*,　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)　　Case No. 3:21-cv-904-OAW
　　v.　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
CANTON BOARD OF EDUCATION,　　　　)
　　*Defendant*.　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)

**RULING ON MOTIONS FOR JUDGMENT ON ADMINISTRATIVE RECORD**

**THIS ACTION** is before the court upon Plaintiffs' motion for judgment on the administrative record, ECF No. 28, and Defendant's cross motion for judgment on the record, ECF No. 39.  The court has reviewed the motions and Plaintiffs' response to Defendant's motion, ECF No. 42, the administrative record, ECF Nos. 30, 31, 32, and any other record in this case.  For the reasons discussed herein, both Plaintiffs' and Defendant's motions are **GRANTED in part and DENIED in part**.

I.　　**STATUTORY SCHEME**

The Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, was designed to "ensure that all children with disabilities have available to them a free appropriate public education, employment, and independent living."  20 U.S.C. § 1400(d)(1)(A).  Under IDEA, states receiving federal funds are required to provide free appropriate public education ("FAPE") to "all children with disabilities."  *Gagliardo v. Arlington Cent. Sch. Distr.*, 489 F. 3d 105, 107 (2d Cir. 2007) (quoting 20 U.S.C. § 1412(a)(1)(A)).

1

In suits brought under IDEA, the court must determine whether a school district's program provides "special education and related services tailored to meet the unique needs of a particular child," and whether the program is "reasonably calculated to enable the child to receive educational benefits."  *Id.*, 489 F.3d at 107 (quoting *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 122 (2d Cir. 1998)).  Such services must be administered according to a written individualized education program ("IEP"), which school districts must implement at least annually.  *Id.* (citing 20 U.S.C. § 1414(d)).

## II.   <u>FACTUAL BACKGROUND</u>

From an early age, Plaintiff John Doe ("Doe") had exhibited signs of various conditions, such as attention deficit hyperactivity disorder (ADHD), anxiety, and disorganization.  *See* Compl. ¶ 19, ECF No. 1.  Still, Doe was a "fairly good student" who had attended Canton Public Schools from kindergarten through 8th grade.  *Id.*

Doe's symptoms worsened over time, and by his 8th grade year, he was described to be "declining behaviorally and in school."  *Id.* ¶ 20.  Concerned, Doe's parents, Mr. and Mrs. Doe (the "Parents"), sent Doe to a parochial school for 9th grade.  *See id.* ¶ 21.  Yet, Doe's conditions did not improve; instead, he started exhibiting signs of depression, suicidal thought, and substance abuse.  *See id.* ¶ 22.  The parochial school did not invite Doe back for the 10th grade.  *See id.*  Consequently, Parents notified Canton Public Schools that they would be returning to the district for Doe to complete 10th grade at Canton High School (CHS), during the 2015-16 school year.  *See id.* ¶ 23.

In August of 2015, shortly before the school year was set to begin, Doe was admitted into the Institute of Living[1] ("IOL") for his mental health and substance abuse conditions.  *See id.* ¶ 24. On September 3, 2015, Doe's parents filed paperwork from IOL with the Canton Public School Board (the "Board" or the "School Board") and requested referral for eligibility under the Individuals with Disabilities Education Act ("IDEA").  Based on IOL's diagnostic impressions, its paperwork recommended (among other things) that Doe be provided "opportunities . . . to access mental health support staff," warning that when Doe's "anxiety becomes unmanageable, he is at risk for subsequent depressive symptoms and impulsive safety issues."  *Id.* ¶ 25.

Thereafter, Parents and the Board met several times.  On September 4, 2015, they met for a "504 Meeting"[2] pursuant to § 504 of the Rehabilitation Act of 1973, to discuss potential accommodations for Doe.  *See id.* ¶ 26.  From the 504 Meeting, it was determined that Doe would be permitted shortened school days, so he could attend a Partial Hospitalization Program (PHP) at IOL.  *See id.*  On September 17, 2015, Parents and the Board held a second 504 Meeting and a study hall was added to Doe's schedule. *See id.* ¶ 27.  The same day, a Planning and Placement Team Meeting (PPT)[3] was held to determine Doe's Individual Education Program (IEP).  *Id.* ¶ 27.  After the PPT, the Board determined that Doe was not eligible for an IEP under the IDEA.  *See id.* ¶ 28.

---

[1] The Institute of Living is a mental healthcare center, with locations in Connecticut.  See *About Us*, Hartford Healthcare, Inst. of Living (last visited Apr. 30, 2024) https://instituteofliving.org/about-us [https://perma.cc/957H-Q6G4].

[2] *See* 29 U.S.C. § 794(a).

[3] A Planning and Placement Team Meeting is attended by certain school officials and is structured pursuant to Connecticut state law and the IDEA.  *See Genn v. New Haven Bd. of Educ.*, 219 F. Supp. 3d 296, 302 (D. Conn. Nov. 30, 2016) (citing Conn. Agencies Regs. § 10-76a-1(14)).  The purpose of a PPT is to "make determinations with respect to the special educational needs of students."  *Id.*

These adjustments did not alleviate Doe's struggles in school, and Parents withdrew him from Canton High School and enrolled him in Summit Achievement, a residential therapeutic treatment center, in Maine.  *See id.* ¶ 29; *see also Our Mission*, Summit Achievement, https://summitachievement.com/our-mission/ [https://perma.cc/TB3X-EZ9Y] (last visited Apr. 30, 2024).  Parents claim Doe "experienced great success" at Summit.  *Id.* ¶ 31.  As part of the discharge paperwork, Summit diagnosed Doe with ADHD, general anxiety disorder, major depressive disorder, and "Sedative, Hypnotic, Anxiolytic Use Disorder, moderate, in remission."  *See id.* ¶ 31.

Without requesting a 504 Meeting or PPT, Parents enrolled Doe at Vermont Academy for the 2016-17 school year, with Doe set to repeat 10th grade there.  *See id.* ¶¶ 32–33; *see also About*, Vt. Acad. https://www.vermontacademy.org/about/welcome [https://perma.cc/B5UL-FV62] (last visited Apr. 30, 2024).  Doe did not experience the success that he had at Summit, failing to cope with the environment and his academic challenges.  *See id.* ¶ 34.

In December 2016, Vermont Academy contacted parents to inform them that Doe had been exchanging "numerous, highly inappropriate messages" with students from Canton High School through social media.  *Id.* ¶ 35.  Vermont Academy had been made aware of Doe's conduct through the Board.  *See id.* ¶ 36.  While the Board took no additional steps—such as convening a 504 Meeting or a PPT—Vermont Academy suspended Doe, requiring him to complete a "Wilderness Program" to be allowed to return.  *Id.* ¶¶ 36–37.

Parents enrolled Doe to attend School of Urban and Wilderness Survival of the Carolinas ("SUWS") to complete the requisite Wilderness Program.[4]  *See id.* ¶ 37.  Doe attended SUWS from December 27, 2016, through February of 2017.  *See id.*  Upon completion, SUWS discharged Doe, with Generalized Anxiety Disorder and Parent-Child Relational Problems among his diagnoses.  *Id.* ¶ 37; ███████████████████████ ████████████████████████████████████████████████  The discharge paperwork recommended that Doe undergo additional psychoeducational testing.  *Id.*

On February 27, 2017, between completing the Wilderness Program and reenrolling at Vermont Academy, Doe attended a basketball game at Canton High School with some of his former classmates, where certain Canton High School students reportedly engaged in "unkind and racially charged" exchanges against students from the opposing high school.  *Id.* ¶ 38.  Doe returned home and shared with Parents that he had engaged in certain chanting.  *See id.* ¶ 40.

Thereafter, a Canton High School administrator, accompanied by Canton Police, visited Doe's home to serve Plaintiff a "no trespass order" dated March 5, 2017.  *See id.* ¶ 41.  Written and signed by the Assistant Principal of Canton High School, it read:

> You are hereby notified and warned that [Doe] is not allowed to attend any Canton High School sanctioned activities or be [on] *any* of the grounds or in the buildings of Canton High School for any reason at any time effective immediately and until further notice.

*Id.* at ¶ 41.  It then cited provisions of the General Statutes of Connecticut through which Doe could be found "Guilty of Trespass in the First Degree," should he violate the order.

---

[4] Although the complaint fails to identify what the acronym SUWS stands for, the court understands this to be wilderness program for teens who struggle with addiction, mental health concerns, and behavioral difficulties.  *See Organization Information*, Nat'l Assoc. of Addiction Treatment Providers https://www. naatp.org/resources/addiction-industry-directory/10668/suws-of-the-carolinas [https://perma. cc/3X65-4U4P] (last visited Apr. 30, 2024).

*See id.*  It concluded by stating this was "sanction" for Doe's behavior during the game. *See id.*  The Board admitted that this was the first time it had resorted to issuing such an order.  *See id.* ¶ 42.  Parents alleged that there was no communication or discussion ahead of the issuance and in-person service of the order, nor did the Board convene a 504 or PPT.  *See id.* ¶¶ 42–43.

This no trespass order was lifted on May 16, 2017, after Parents wrote to the School Board stating that Doe sought to attend his sister's graduation and that Doe may need to return to Canton High School for the 2017-18 school year.  *See id.* ¶¶ 44, 45, 47. In lifting the no trespass order, the Board did not convene at 504 or PPT.  *See id.* ¶ 46.

Amidst these interaction between Parents, Doe, and the Board, Doe completed the remaining months of the 2016-17 academic year at Vermont Academy, having already completed SUWS.  *See id.* ¶ 48.  Due to Doe's conduct at the basketball game, he was not invited back to Vermont Academy for the 2017-18 year.  *See id.*  This meant that he would return to Canton High School for 11th grade during the 2017-18 academic year. *See id.* ¶ 49.

In preparation for the 2017-18 school year, Doe participated in "intensive therapy" over the summer and Parents wrote to the Board—almost a month before school—to enroll Doe.  *See id.* ¶¶ 49, 51.  Specifically, on August 2, 2017, Doe's mother contacted Canton High School requesting a 504 Meeting in advance of the upcoming school year. *See id.* ¶ 51.  Parents then followed instructions from the Board: filing various referral and permission forms, contacting Pupil Services at Canton High, and arranging Doe's therapist to communicate directly with the Board.  *See id.* ¶ 51.

The next day, on August 3, 2017, Doe's mother wrote to Pupil Services to request a PPT, describing Doe's history of diagnoses, and emphasizing the need for prompt adjustments to enable a "seamless" transition back to Canton High School.  *Id.* ¶ 52.  An administrative representative from Canton High School responded on August 7, 2017, requesting, in turn, various paperwork to be filed.  *See id.* ¶ 53.  That same day, Doe's mother did as instructed, signing off on all relevant forms, including a referral form to determine eligibility for special education and related services.  *See id.* ¶ 54.

Despite multiple attempts by Doe's mother to revisit her request for a PPT, the Board did not convene one before the first day of school for 2017-18.  *See id.* ¶¶ 55–57. Instead, an "informal meeting" was scheduled for the first day of school, August 30, 2017. *See id.* ¶ 57.  The PPT itself was scheduled for September 5, 2017, almost a week after school had begun.  *See id.* ¶¶ 58–59.  Plaintiffs' concerns were exacerbated by the informal meeting, which led to Parents deciding against sending Doe to school on the first day of the year.  *See id.* ¶¶ 61–63.

At Parents' invitation, Doe's psychologist attended the PPT on September 5, 2017, and provided information about Doe's specific needs and subsequent recommendations. *See id.* ¶ 64.  After the meeting, a diagnostic placement[5] at Canton High was proposed. *See id.* ¶ 65.  As part of the diagnostic placement, Doe would receive "Study Skills class 4 times per week; 1 time a week counseling; and daily check ins."  *Id.*  These measures were aimed at achieving two goals, a "Study Skills goal and one social/behavioral goal." *Id.*  Doe began to attend classes soon after the PPT.  *See id.* ¶ 67.

---

[5] While not defined in the complaint, diagnostic placements are "a trial placement for diagnostic purposes as part of the initial evaluation or reevaluation of the child."  Conn. Agencies. Regs. § 10-76d-14.

Within two weeks of attending classes on the diagnostic placement schedule, Doe was failing academically and exhibited signs of anxiety and agitation.  *See id.* Subsequently, he was referred for a suspension, with the school accusing him of sending "an inappropriate email" to the entire 11th grade.  *Id.* ¶ 68.  The situation escalated on September 20, 2017, when a video of Doe holding a firearm, with a single word "warning," was circulated across social media.  *See id.* ¶ 69.  In a mass email to the community, Canton's Superintendent called the video a direct warning against CHS, and publicly announced that there were ongoing criminal investigations and that the student featured in the video would not be attending school for a few days as the investigation continued. *See id.* ¶ 70.  Parents wrote to the Superintendent, requesting another mass email to the community to clarify that Doe was not a threat to the community.  *See id.* ¶ 71.  Doe's psychologist separately wrote to the Board, attempting to explain how Doe's involvement in the video may have been related to his previously diagnosed conditions.  *See id.* ¶ 73. The Board responded by notifying Parents that it intended to move forward with expulsion proceedings as a direct result of the video.[6]  *See id.* ¶ 74.

With the situation escalating, Plaintiffs retained legal counsel to represent Doe through future PPTs.  *See id.* ¶ 75.  Another PPT was convened on October 17, 2017 (with counsel present), to determine whether, and how, Doe's conduct in the video could be related to his diagnosed conditions and disabilities.  *See id.* ¶ 75.  That PPT recommended changing the location of the diagnostic placement to a state-approved special education therapeutic institution, postponing discussions about how Doe's conduct may be related to his disabilities, pending additional psychiatric testing.  *See id.*

---

[6] However, the Board later declined to pursue expulsion "because [Doe] was in the process of being evaluated for special education eligibility."  Final Decision and Order 12, ECF No. 1-2.

On November 21, 2017, the Board followed the recommendation of the PPT by placing Doe in a diagnostic placement at Wheeler Clinic's Northwest Village School ("Northwest Village").  *See id.* at ¶ 79; Final Decision and Order 11, ECF No. 1-2.  During Doe's time there, Wheeler Clinic's Diagnostic Assessment and Referral Team ("DART") conducted various evaluations, reporting on its findings.  *See* Compl. ¶ 85, ECF No. 1. The report diagnosed Doe with various mental disorders, such as social anxiety disorder, substance dependency, ADHD, and binge eating disorder.  *See id.*

After the report was issued, another PPT was held on April 4, 2018, to determine Doe's eligibility for an IEP under the IDEA.  *See id.* ¶ 86.  There, Doe was deemed eligible for an IEP due to "Emotional Disturbance," and was placed at Northwest Village.  *See id.* In the final PPT on March 19, 2019, Doe was recorded as stating that he would "participate in the Northwest Village graduation" but with CHS colors.  *Id.* ¶ 89.

Then, on May 15, 2019, Plaintiffs requested a due process hearing.  *See* Final Decision and Order 2, ECF No. 1-2.  Parents sought reimbursement for the cost of providing Doe a FAPE equivalent.  *See* Compl. ¶¶ 91–92, ECF No. 1.  "Evidentiary hearings were convened on October 8, 2019, October 25, 2019, October 26, 2020, and December 1, 2020."  Final Decision and Order 2, ECF No. 1-2.  After allowing either party to submit any additional briefs, Hearing Officer ("HO") Ann Bird from the Department of Education of the State of Connecticut issued a decision on May 17, 2021.  *See* Final Decision and Order 1, ECF No. 1-2.  The HO determined:

1. The events before May 15, 2017, were barred from review by the relevant statute of limitations.

2. Defendant did not deny Doe FAPE after May 15, 2017.

3. Defendant was not responsible for reimbursing Doe for the expenses of Doe's matriculation at Summit Academy, Vermont Academy, and/or SUWS of the Carolinas, or for fees related thereto.

4. Defendant was not responsible for providing compensatory education for Doe.

*See id.* at 21.  Plaintiffs filed a complaint on June 30, 2021, raising claims under the IDEA, as well as Section 504 of the Rehabilitation Act and Title II of the Americans with Disabilities Act.  *See generally* Compl., ECF No. 1.  After a response from Defendant was filed on October 20, 2021, *see* ECF No. 15, Plaintiffs filed a motion for judgment on the administrative record on July 11, 2022.  *See* ECF No. 28.  Defendant filed a cross motion for judgment on the administrative record on October 6, 2022.  *See* ECF No. 40.

## III.   <u>LEGAL STANDARD</u>

District courts reviewing IDEA administrative decisions make findings "based on a preponderance of the evidence" by independently reviewing the administrative record. *Bd. of Educ. of Yorktown Cent. Sch. Dist. v. C.S.*, 990 F.3d 152, 165 (2d Cir. 2021) (quoting *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 226 (2d Cir. 2012)).

Still, district courts are cautioned against "substitut[ing] their own notions of sound educational policy for those of the school authorities which they review."  *M.H.*, 685 F.3d at 240 (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., v. Rowley*, 458 U.S. 176, 206 (1982)).  That deference to schools reflects the understanding that the judiciary "lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy."  *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 113 (2d Cir. 2007).  "Deference is particularly appropriate when . . . the state hearing officers' review has been thorough and careful."  *P. ex rel. Mr. & Mrs. P. v. Newington Bd.*

10

*of Educ.*, 546 F.3d 111, 118 (2d Cir. 2008) (quoting *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 129 (2d Cir. 1998)).

To that end, federal courts must avoid "simply rubber stamp[ing] administrative decisions" while giving "due weight" to administrative proceedings. *Walczak*, 142 F.3d at 129. Such a review is more than a "clear-error review but falls well short of a complete de novo review." *L.O. v. N.Y.C. Dep't of Educ.*, 822 F.3d 95, 108–09 (2d Cir. 2016).

Though "typically style[d]" in summary judgment format, the motion represents "an appeal from an administrative determination" and, crucially, is not a summary judgment motion. *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 226 (2d Cir 2012).

## IV.   DISCUSSION

Plaintiffs seek reversal of the administrative decision, and reimbursement for various educational costs incurred by Doe's parents, and for attorneys' fees associated with this case. *See* Compl. 29, ECF No. 1; Final Order and Decision 21, ECF No. 1-2 (finding that Defendant is not responsible for reimbursing Plaintiffs).

### A.  Statute of Limitations

According to Defendants, the "sole issue" before the court is whether Defendant failed to evaluate Doe during the summer of 2017. Def.'s Mot. 7 n.4. This is because all other claims were determined to be outside of the statute of limitation and therefore waived by Plaintiffs. *See id.*

The court agrees. Timeliness of IDEA claims are determined "with reference to the 'most appropriate or analogous state statute of limitations.'" *Somoza v. N.Y.C. Dep't of Educ.*, 538 F.3d 106, 114 n.7 (2d Cir. 2008) (quoting *M.D. v. Southington Bd. of Educ.*,

334 F.3d 217, 221–22 (2d Cir. 2003)).   Under Connecticut law, a "party shall have two years to request a hearing from the time the party knew or should have known about the public agency proposal or refusal to initiate or change the identification."  Conn. Agencies Regs., § 10-76h-4(a).   However, if the parent or guardian is not notified of IDEA's procedural safeguards, the two-year limitation is calculated from the "time the notice of the safeguards is properly given."  *M.D.*, 334 F.3d at 220.  ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

Plaintiffs filed their request for a due process hearing on May 15, 2019.  *See* Final Decision and Order 3, ECF No. 1-2 (noting, under the "Summary" section that claims challenging Defendant's decision to not identify the student for the 2015-16 year had been barred by the statute of limitations).  Plaintiffs present no arguments to suggest that their claims may have been tolled in the interim.[7]

Therefore, any claim against Defendant's decisions prior to May 2017 is beyond the statute of limitations and shall not be considered.  Accordingly, as determined by the HO in her Final Decision and Order, this leaves only the outcome and circumstances surrounding the 2017 PPT subject to review by this court.

**B.  Claims of Procedural Violations**

Plaintiffs challenge the substance of the HO decision, and its interpretation of the Board's child-find obligations.  After careful review, the court determines that Defendant

---

[7] Although Plaintiffs state that "Section 504 has a 3 year, not 2-year, statute of limitations," *See* Pls.' Mot. for Judgment on the Administrative Record 41 n.18, ECF No. 28-1 ("Pls.' Mot."), the complaint was filed on June 30, 2021.  *See* Compl., ECF No. 1.  Even under a three-year statute of limitations, Plaintiffs' claims—as they pertain to events before May 2017—are untimely, and the court cannot exercise jurisdiction over them.

had an affirmative obligation to identify, locate, and evaluate Doe, but that Plaintiffs have failed to timely raise any claims that Defendant violated its child-find obligations within the period of time that such conduct or inaction would be subject to the court's present review.

### 1. *Affirmative Obligation to Identify, Locate, and Evaluate*

Plaintiffs argue that Defendant failed to comply with its child-find obligation to locate and evaluate Doe. *See* Pls.' Mot. for Judgment on the Administrative Record 27, ECF No. 28-1 ("Pls.' Mot."). The court finds that the duty to identify, locate, and evaluate Doe fell on Defendant, even without any requests from Plaintiffs for an evaluation.

States receiving federal funds under IDEA must ensure that "[a]ll children with disabilities residing in the State, including children with disabilities who are homeless children or are wards of the State, and children with disabilities attending private schools, regardless of the severity of their disability . . . are identified, located, and evaluated." 34 C.F.R. § 300.111(a)(1)(i). Thereafter, the state must develop and implement a practical method to "determine which children are currently receiving needed special education and related services." *Id.* § 300.111(a)(1)(ii). However, this requirement "does not demand that schools conduct a formal evaluation of every struggling student." *Id.* (citations omitted). Instead, courts have held that "a state's child find duty is 'triggered' when it 'has a reason to suspect a disability, and reason to suspect that special education services may be needed to address that disability.'" *J.S. v. Scarsdale Union Free Sch. Dist.*, 826 F. Supp. 2d 636, 660 (S.D.N.Y. 2011) (citations omitted). This obligation extends to students "who are suspected of having a disability, despite that the children may be progressing from grade to grade in an acceptable manner." *Murphy v. Town of Wallingford*, No. 3:10-cv-278(CFD), 2011 WL 1106234, at *3 (D. Conn. Mar. 23, 2011)

(citing 34 C.F.R § 300.111(c)(1)).  A violation of the Child Find obligation is considered a "procedural violation of the IDEA."  *Mr. P. v. W. Hartford Bd. of Educ.*, 885 F.3d 735, 549 (2d Cir 2018) (citing *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 249 (3d Cir. 2012)).

Plaintiffs correctly point out that the IDEA ascribes an affirmative obligation for the school to identify, locate, and evaluate children with disabilities residing in the state.  34 C.F.R. § 300.111 (codified at 20 U.S.C. § 1412(a)(3)).  This affirmative responsibility "is not ended by enrollment of a resident child in a private school outside the district."  *Doe v. E. Lyme Bd. of Educ.*, 790 F.3d 440, 450–51 (2d Cir. 2015).  Instead, the duty to offer a FAPE "remains with the agency where the child resides; and a FAPE cannot be offered unless an IEP is issued."  *Id.* (citing to 71 Fed. Reg. 46593 (Aug. 14, 2006)).

In the Final Decision and Order, the Hearing Officer ("HO") drew a distinction between the obligation to find the child and the obligation to evaluate the child.  *See* Final Decision and Order 16, ECF No. 1-2.  Such a distinction is not supported by law.  Section 1412(a)(10)(A)(ii)(I) of Title 20 of the United States Code states that child-find requirements "shall apply with respect to children with disabilities in the State who are enrolled in private including religious, elementary schools and secondary schools."  Child-find requirements include identification, location, and evaluation of children with disabilities.  *Id.* § 1412(a)(3)(A).[8]  The HO cited to *District of Columbia v. Abramson*, 493 F. Supp.2d 80 (D.D.C. 2007), in ruling that child-find obligations do not extend to "children who are attending private schools located outside of the school district."  Final Decision and Order 16, ECF No. 1-2.  However, *Abramson* held that such obligations attach in a

---

[8] Even the Letter to Eig, to which Defendant cites, states that each local educational agency ("LEA") must "locate, identify, and *evaluate* all children with disabilities who are enrolled by the parents in private . . . schools located in the LEA."  Letter to Eig, 52 IDELR 136 (OSEP 2009) (citing to 34 C.F.R. § 300.131(a)) (emphasis added).

child's district of residence.  *See* 493 F. Supp. 2d at 86 (holding that District of Columbia Public Schools must fulfill responsibilities as "the LEA of residence," regardless of the fact that the student was enrolled in a Connecticut school).

Defendant cites to *M.A. v. Torrington Board of Education* for the proposition that the parents' request for reevaluation is the only way to trigger the child-find responsibility. However, Defendant omits the very next sentence, wherein that court emphasized, "[R]esidency, rather than enrollment, triggers a district's FAPE obligations."  980 F. Supp. 2d 245, 269 (D. Conn. 2013).  To be sure, parental request may trigger a school board's evaluation of a student, but it does not shift a school's obligation to a parent.  *See Murphy*, 2011 WL 1106234, at *4 (holding that, while "parents are afforded procedural protections" and may "provide input," the onus of responsibility is "placed on schools to initiate the IDEA process").  In fact, a parent's request for an evaluation may extend the child-find obligation to another school district.  *See Abramson*, 493 F. Supp. 2d at 85–86.  However, it would not excuse the student's home district from fulfilling its own obligation.  *See id.*

Findings of fact by the HO confirm that "[d]uring the relevant time, [Doe] resided with his mother and father and siblings in Canton, Connecticut."  Final Decision and Order 3, ECF No. 1-2.  Defendant does not contest this fact.  With child-find obligations firmly rooted in the student's place of residence, it is clear that this duty was not affected by the decision to enroll Doe in private institutions outside of the school district.  Therefore, the court finds that the HO was incorrect to determine that Defendant had no child-find obligations towards Plaintiff Doe.  Still, the courts review has legal limits.

2. _Reasonable Determination for Doe's Need for Evaluation_

Having found that Defendant had an affirmative duty to identify, locate, and evaluate does not end the court's review.

"To hold a school district liable for failing to identify a student who should be evaluated for purposes of receiving special education, a claimant must show that school officials overlooked clear signs of disability and were negligent in failing to order testing, or that there was no rational justification for not deciding to evaluate." _W.A. v. Hendrick Hudson Cent. Sch. Dist._, 927 F.3d 126, 144 (2d Cir. 2019) (quoting _Mr. P._, 855 F.3d at 750). Because Plaintiffs claim that Defendants failed to evaluate Doe in a timely manner, the court "must focus on what the [school district] knew and when." _K.B. ex rel S.B. v. Katonah Lewisboro Union Free Sch. Dist._, No. 18-cv-9553(CS), 2019 WL 5553292, at *8 (S.D.N.Y. Oct. 28, 2019) (quoting _J.S._, 826 F. Supp. 2d at 662).

Under this standard, even if Plaintiffs timely had raised their claims, Defendant would not have been found negligent in failing to order testing.

Plaintiffs claim that Defendant had "ample data" to suggest that Doe required an evaluation under Child Find obligations ahead of the 2017-2018 school year. In support, Plaintiffs point to Defendant's own determination in 2015 that Doe would require a 504 Plan. _See_ Pls.' Mot. 29. Plaintiffs continue, outlining all information "available to [Defendant] before the start of the 2017-2018 school year." _Id._ at 30. Summed up, Plaintiffs claim that Defendant should have been aware of Doe's need for an evaluation for an IEP well in advance of the Parents' request in the summer of 2017. While Plaintiffs' argument cites to events that occurred outside of the statute of limitations, the court may look to such events for "evidence of child-find violations." _Mr. P._, 885 F.3d at 750.

i.   *Meetings from 2015*

The court starts, as Plaintiffs did, with meetings held in 2015.  To the extent the record of such meetings can present potential evidence of a child-find violation, such evidence instead demonstrates that Defendant was reasonable in its approach.

The first of these meetings was a 504 Meeting held on September 4, 2015.  *See* Compl. ¶ 26.  The Board introduced certain accommodations as a result of this meeting. For example, Doe would be subject to a shortened school day such that he may continue attending a partial hospitalization program, ████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████   *See id.*; ████████████████████████████   Afterward, Defendant's PPT held a second 504 Meeting with Plaintiffs on September 17, 2015.  *See* Compl. ¶ 27.  That meeting added a study hall to Doe's schedule.  *See id.*  Despite Plaintiffs' allegation that the Board did not undertake "any evaluation" of Doe, ████████████ ████████████████████████████████████████████████████████████████ ██████████   ██████████   ████   ██████████   ██   ██████   ████████   ██████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████

As Plaintiffs admit, Defendant had the relevant data available to it when making these determinations.  *See* Pls.' Mot. 30, ECF No. 28.  Moreover, Defendant's actions upon considering such data show the reasonableness of its actions, ████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████   ████████████████████████████

███████████████   Therefore, the record therefore suggests that Defendant not only considered the information submitted by Parents, but that it had conducted its own evaluation before adopting a plan for Doe.

Plaintiffs' response to the 2015 meetings suggest that they agreed with the Board's assessment, though they now claim Doe received only a "paucity" of support therefrom. Pls.' Mot. 17.  Plaintiffs did not challenge the outcome of the 2015 meeting until the instant complaint.  Defs.' Mot. 10.  They admit, and the Final Decision Order confirms, that Parents were present at the 2015 PPT Meeting.  *See* Final Decision and Order 17, ECF No. 1-2 (noting that Doe's parents had not testified against the decision of the Board). Given the lack of dialogue between Plaintiffs and the Board, there would have been little reason for Defendant to have second-guessed its decision.  *See Schaffer ex rel Schaffer v. Weast*, 546 U.S. 49, 53 (2005) (declaring that the "core" of the IDEA process "is the cooperative process that it establishes between parents and schools").

### ii.  Events from 2016 to 2017

Plaintiffs next point to Doe's "November 2016 and February 2017 interactions with other Canton High School students."  Pls.' Mot. 30.  The court understands this strand of argument to suggest that, based on events which occurred after the 2015 meetings but prior to the 2017 meetings, Defendant reasonably should have known a need to identify, locate, and evaluate Doe.  The court disagrees.

For one, in withdrawing Doe from Canton High School in 2015, Defendant "was told only that the reason . . . was to attend a different school."  Def.'s Mot. 10 (citing Final Decision and Order 7, ECF No. 1-2).  Plaintiffs concede that they did not send "detailed educational records from the programs [Doe] attended from October of 2015 through

August 7, 2017."   Pls.' Resp. to Def.'s Cross-Mot. for Judgment on the Administrative Record 9, ECF No. 41-1 ("Pls.' Resp.").   Plaintiffs do not respond to Defendant's allegation, based on the HO's findings, that the Board had "no information about [Doe's] education or progress from October 19, 2015, when he left CHS, until August 3, 2017." Defs.' Mot. 10.  Without new evidence to suggest that its prior evaluation was outdated, Defendant had no reason to seek out Doe for an updated determination.  *See Mr. P*, 885 F.3d at 750–51 (agreeing with the district court that the school board was "reasonable" to maintain status quo in the absence of new evidence).

Further, while it is true Defendant had knowledge of records submitted as part of the 2015 meetings and communication with Vermont Academy's Headmaster, *see* Pls.' Resp. 10, the absence of any consistent dialogue between Doe's parents and Defendant undermines Plaintiffs' argument.   *See Schaffer ex rel Schaffer*, 546 U.S. 49 at 53 ("Parents and guardians play a significant role in the IEP process."); *Bd. of Educ of Hendrick Hudson Ctr. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 205 (1982) (holding that "Congress placed every bit as much emphasis upon compliance with procedures giving parents and guardians a large measure of participation at every state of the administrative process"). ██████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████  Communication between Parents and the Board seems especially important here

because conditions related to emotional disturbance may be most accurately diagnosed when monitored for a "long period of time." *Mr. P*, 885 F.3d at 751 (citing 34 C.F.R. § 300.8(c)(4)(i)). It would have been particularly difficult for Defendant to identify "clear signs of disability," *W.A.*, 927 F.3d at 144, especially if those signs only become apparent "to a marked degree" through "a long period of time." 34 C.F.R. § 300.8(c)(4)(i).

Plaintiffs mistakenly conflate the Board's decision to issue a no trespass order as proof that Defendant knew of Doe's disability. *See* Pls.' Mot. 29. The HO sufficiently addressed and dismissed this argument in its Final Decision and Order by determining that the Board's treatment of Doe "between October 19, 2015[,] and August 3, 2017, including sharing his December 3, 2016[,] social media post with Vermont Academy and barring him from school grounds after the basketball game, were *unrelated to any special education evaluation, program, or placement* and therefore outside this Hearing Officer's jurisdiction." Final Decision and Order 19 n.6, ECF No. 1-2 (citing to 34 C.F.R. § 300.507) (emphasis added); *see id.* at 20 (noting that a similar instance when Doe's picture was displayed at CHS with a "Call 911" message was "not cognizable under IDEA"). Although the Final Decision and Order lacks articulation as to the rationale behind this finding, the court finds that the record supports this determination by a preponderance of the evidence. *See W.A.*, 927 F. 3d at 143, 149. Absent objection from Parents in the aftermath of the 2015 PPT Meetings, *see* Defs.' Mot. 10, the Board reasonably could have assessed Doe's conduct in conjunction with their prior evaluation that ███████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████   In other

words, Defendant, like the HO, may not have found Doe's conduct to have been "relevant

information" about the "educational needs of the child."  20 U.S.C. § 1414(b)(3)(C).  The

issuance of the no trespass order reflects the seriousness with which the Board had

considered Doe's conduct.  If, after deliberate analysis, Defendant determined that this

was not relevant information, it would not be the place of this court to substitute its "own

subjective analysis," with that of the HO or the Board.  *W.A.*, 927 F. 3d at 149.

For these reasons, although the court finds that child-find obligations instill an

affirmative obligation upon Defendant, the Board was not negligent in declining to initiate

additional evaluations ahead of the 2017-2018 school year.

**C.  IEP Determination**

Having established that Defendant had not violated its affirmative obligation under

relevant child-find provisions, the court next looks to the timing and outcome of the IEP

meeting held ahead of the 2017-18 school year.

1.  *Timeliness under Connecticut Regulation*

i.  *Initial PPT Meeting*

Plaintiffs' first contention is that Defendant unlawfully delayed the convention of

the PPT Meeting in response to the referral submitted by Parents.  *See* Pls.' Mot. 37.  The

court disagrees with Plaintiffs' argument and finds that the initial PPT Meeting on

September 5, 2017, was scheduled in a timely manner.

As part of their child-find obligation, states must evaluate a student upon a request

by the student's parent, the school district, or others.  *See* 20 U.S.C. § 1414(a)(1)(B).

"Once such a request has been made, the IDEA requires the State to conduct an initial evaluation of the student 'within 60 days of receiving parental consent for the evaluation,' or within the timeframe established by the State if the State has established its own timeframe." *Mr. P*, 885 F.3d at 749–50 (quoting 20 U.S.C. § 1414(a)(1)(C)(i)(I); 34 C.F.R. § 300.301(c)(1)(i)–(ii). "In the case of a referral made between school years, the effective date of the referral may be deemed to be the first school day of the next school year." Conn. Agencies Regs. § 10-76d-13(b).

Under the IDEA, Doe had not been identified as a student with disabilities ahead of the 2017-2018 school year.[9] *See* Def.'s Mot. 9 (noting that at the time his parents withdrew him from Canton High School during the 9th grade, Doe "was not identified as a student with disability"); ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Instead, on August 7, 2017, Plaintiffs triggered Defendant's IDEA obligation by requesting that Doe be evaluated. *See* Defs.' Mot. 19; Pls.' Mot. 13; ▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮ The first day of school for that year was August 30, 2017, *see* Pls.' Mot. 14, and the PPT Meeting was convened on September 5, 2017, *see* Pls.' Mot. 16; ▮▮▮▮▮

▮▮▮▮▮▮▮▮

Relevant Connecticut regulations support the finding of the HO that the Board "did not violate the Student's right under the IDEA . . . because it appropriately and timely



---

[9] Plaintiffs claim Defendant previously identified Doe as a student requiring a 504 Plan, "thereby obviously recognizing that he was a student with a disability." Pls.' Mot. 29. ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮ *see also B.C. v. Mount Vernon Sch. Dist.*, 837 F.3d 152, 159 (2d Cir. 2016) (holding that "Section 504 define[s] the term 'disability' differently than the IDEA does" and that "under the IDEA, a 'child with a disability' has one or more of an enumerated list of impairments requiring 'special education or related services'").

evaluated and identified him as eligible for special education and offered him FAPE."
Final Decision and Order 19, ECF No. 1-2.  Because the referral was filed between school
years, Defendant could consider the referral date to be the first school day of 2017, or
August 30, 2017.  *See* Conn. Agencies Regs. § 10-76d-13(b).  The notice for the PPT
meeting was issued on ████████ (before the lawfully effective referral date).  *See*
*R.R. v. Greenwich Bd. of Educ.*, No. 3:21-CV-00873(JCH), 2023 WL 3737714, at *10 (D.
Conn. May 31, 2023) (interpreting Conn. Agencies Regs. § 10-76d-8).  The PPT Meeting
itself was convened only four days after the effective referral date.  *See* Conn. Agencies
Reg. § 10-76a-1(5) ("'Days' means school days unless otherwise specified.").

Plaintiffs argue that Defendant had knowledge of Doe's disability or at least that
Defendant had enough information such that it reasonably should have known that Doe
had a disability.  *See* Pls.' Mot. 30–35; Pls.' Resp. 9–11.  While not underestimating the
seriousness of Doe's conditions, the court does not find support for Plaintiffs' argument
that Defendant's alleged "extensive notice" of the situation required expedited review.
Plaintiffs' citation to *Endrew F. ex rel. Joseph F. v. Douglas County School District RE-1*,
can be distinguished from the current case, because that decision speaks to the
substantive nature of the IEP, rather than the timing of the issuance of the IEP.  *See* 580
U.S. 386, 403 (2017) ("[The IDEA] requires an education program reasonably calculated
to enable a child to make progress appropriate in light of the child's circumstances.").

> *ii.*    *Provision of IEP*

Plaintiffs' next contention is that Defendant unlawfully delayed finding Doe to be a
student with disability, thereby requiring an IEP.  *See* Pls.' Mot. 38.  The court disagrees
and finds that Defendant's determination was timely.

"Connecticut regulations require that 'special education and related services shall be provided as soon as possible after the planning and placement team meeting held to review, revise, or develop the child's individualized education program." *Mr. P*, 885 F.3d at 749–50 (citing Conn. Agencies Regs. § 10-76d-13).   An IEP must be "implemented within 45 school days of 'referral or notice, exclusive of the time required to obtain parental consent.'" *Id.* (citing Conn. Agencies Regs. § 10-76d-13(a)(1)).   For this purpose, the effective date of a referral made between school years, "may be deemed to be the first school day of the next school year."  Conn. Agencies Regs. § 10-76d-13(b).

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████   A series of diagnostic placement exams also were scheduled.  *See* Final Decision and Order 11, ECF No. 1-2.   When Doe repeatedly engaged in inappropriate behavior during this evaluation period, the Board made adjustments to its initially proposed evaluation plan, thereby including an additional "Functional Behavior Assessment."  *Id.*; *see id.* at 12 (noting that another PPT Meeting was convened on October 17, 2017, to discuss the Gun Post on social media).  Following the PPT Meeting held on October 17, 2017, the PPT determined, and the school psychologist agreed, that an out-of-district therapeutic placement was "necessary."  *Id.* at 12.  Doe was placed in Wheeler Clinic's Northwest Village School ("Northwest Village").  *See id.*  There, Wheeler evaluated Doe's conditions and compiled the results into a Diagnostic and Referral Team Report ("DART Report").  *See id.* (noting, additionally, that Doe's parents and the family's attorney had agreed that the DART Report had accurately described Doe's condition).  Taking both the DART Report and Doe's performance at Northwest Village, the Board

convened a PPT Meeting on April 4, 2018, at which the PPT determined that Doe was eligible for special education.  *See id.*; █████████████████████████

In light of these developments, the HO determined the Board did not violate Doe's rights under the IDEA.  *See* Final Decision and Order 19, ECF No. 1-2.  The court finds that this determination was reasonable.

Doe ultimately was diagnosed as a student with a disability on April 4, 2018, but he was in a special education trial placement (for diagnostic purposes) as early as September 6, 2017.  *See* Def.'s Mot. 23–24.  "If a trial placement for diagnostic purposes is conducted as part of a referral, the timeline for the implementation of the IEP in accordance with [Conn. Agencies Reg. § 10-76d-13] shall be extended by the PPT for the time necessary to complete the trial placement for diagnostic purposes."  Conn. Agencies Reg. § 10-76d-14.  Such a trial placement complies with § 10-76d-10(b) of the Connecticut State Agency Regulation, which requires the planning and placement team to conduct "an evaluation, in accordance with the provisions of the IDEA, before initial provision of special education and related services to a child with disability."  This evaluation is important, as the IDEA requires that a school district to assess the child "in all areas of suspected disability."  20 U.S.C. § 1414(b)(3)(B).  Additionally, Defendant adjusted and altered its initial evaluation plan upon assessment by the HO, when it felt that Doe was threatening violation thereof.  *See* Final Decision and Order 19–20, ECF No. 1-2.  These reevaluations are consistent with the requirements of IDEA and they partially explain any resultant delays.  *See* 20 U.S.C. § 1414(c)(1).[10]

---

[10] It also bears noting that, despite their complaint, Doe's parents initially had agreed to his placement within this trial program, and had engaged with the PPT throughout all subsequent meetings to review and adjust Doe's trial placement.  *See* Def.'s Mot. 23; ██████████████████████████████

2. *Timeliness under the IDEA*

Plaintiffs also cite to 20 U.S.C. § 1414(d)(2)(A) of the IDEA, which states, "At the beginning of each school year, each local educational agency, State educational agency, or other state agency, as the case may be, shall have in effect, for each child with a disability in the agency's jurisdiction, an individualized education program."  Pursuant thereto, Plaintiffs claim that Defendant procedurally violated the IDEA by failing to implement an IEP by the first day of the 2017-2018 school year.  *See* Pls.' Mot.  36–37.  This argument is unavailing.

There is a distinction between the definition of "disability" under Section 504 of the Rehabilitation Act and the definition of "child with a disability' under IDEA.  Section 504, adopting the language of the Americans with Disabilities Act, defines "an individual with a disability" as someone who:

(i)     Has a physical or mental impairment which for such individual constitutes or results in a substantial impediment to employment; and
(ii)    Can benefit in terms of an employment outcome from vocational rehabilitation services . . .

29 U.S.C. § 705(20)(B).  On the other hand, IDEA defines a "child with a disability," with a focus on the child's need for specialized education.  Relevant provision states:

The term "child with a disability" means a child--

(i)     with intellectual disabilities, hearing impairments (including deafness), speech or language impairments, visual impairments (including blindness), serious emotional disturbance (referred to in this chapter as "emotional disturbance"), orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities; and
(ii)    who, by reason thereof, needs special education and related services.

---

██████████████████████████  *see also* Final Decision and Order 10, ECF No. 1-2 (noting that Doe's parents had engaged a special education attorney to represent the student by August 21, 2017).

20 U.S.C. § 1401(3)(A).

As evident in the contrasting language, the Rehabilitation Act and IDEA set forth "distinct legal standards" in their definitions of "disability," such that an individual will not qualify for protections under the Rehabilitation Act simply by virtue of their disabled status under the IDEA. *B.C. v. Mount Vernon Sch. Dist.*, 837 F.3d 152, 160 (2d Cir. 2016). The opposite also is true: "some children who qualify for a 504 plan may not qualify for an IEP." *R.A. v. State of CT. Dep't of Educ.*, No. 3:16-cv-1215(MPS), 2016 WL 5923411, at *2 n.3 (D. Conn. Oct. 11, 2016). Therefore, the fact that Doe previously had been identified as a student in need of a 504 accommodation had not qualified him as a child with disability under the IDEA.

The record indicates that prior to April 4, 2018, the Board had not determined that Doe was eligible for an IEP. *See* Pls.' Mot. 21; ███████████████████ ███████████████████████████████████████ ███████████████████████████████████████ █████████████████████████████████ Only after conducting "a full and individual initial evaluation" did Defendant declare that Doe was a child with disability, who was eligible for an IEP.

The IEP was implemented that same day, on April 4, 2018. *See* Pls.' Mot. 21. There is no procedural violation where the Board provides the student with an IEP on "the same day it determined that [the student] was in need of special education." *R.R.*, 2023 WL 3737714, at *9.

### D.  504 and ADA Claims

Finally, Plaintiffs argue that Defendant's conduct justifies "damages under Section 504 [of the Rehabilitation Act] and the ADA."  Pls.' Mot. 40.  Defendant makes multiple arguments in response: first, it claims that Plaintiffs have failed to exhaust their administrative remedies, then, in the alternative, it asserts that Plaintiffs' claims are untimely or legally insufficient.  *See* Def.'s Mot. 28–39.

The court finds that Plaintiffs have failed satisfy the administrative exhaustion requirement for their Section 504 and ADA claims.

The "scope of [IDEA's] exhaustion requirement becomes more complex" when plaintiffs assert causes of actions in addition to their IDEA claim.  *R.R. v. Greenwich Bd. of Educ.*, No. 3:21-cv-00873(JCH), 2022 WL 1443979, at *2–3 (D. Conn. May 6, 2022).  The relevant provision of the IDEA states as follows:

> Nothing in [the IDEA] shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990, title V of the Rehabilitation Act of 193, or other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under [20 U.S.C. §§ 1415(f); 1415(g)] shall be exhausted to the same extent as would be required had the action been brought under this subchapter.

20 U.S.C. § 1415(l).  The exhaustion rule of this section "hinges on whether a lawsuit seeks relief for the denial of a FAPE."  *Fry v. Napoleon Cmty. Sch.*, 580 U.S. 154, 168 (2017).  "If the lawsuit charges such a denial, the plaintiff cannot escape § 1415(l) merely by bringing her suit under a statue other than the IDEA—as when, for example, . . . [certain plaintiffs claim] that a school's failure to provide a FAPE also violated the Rehabilitation Act."  *Id.*  However, if the "remedy sought is not for the denial of a FAPE, then exhaustion of the IDEA procedures is not required."  *Id.*  This is because the non-

FAPE relief sought by plaintiff is not available through the administrative procedures designed for the IDEA.  *See id.* (ruling that the "only 'relief' the IDEA makes 'available is the relief for the denial of a FAPE'").   The court must therefore determine what the "gravamen of the complaint" against is a school is.  *Id.* at 169.

There are two questions the court must address for this determination: first, whether the plaintiff could have brought "essentially the same claim if the conduct had occurred at a public facility that was not a school" and, second, "could an adult at the school—say, an employee or visitor—have pressed essentially the same grievance?" *R.R.*, 2022 WL 1443979, at * 3.

The court answers each of these questions in the negative.

Plaintiffs' second claim, under Section 504 and the ADA, is "predicated on a denial of FAPE."  *Horelick v. Lamont*, No. 3:21-cv-1431, 2023 WL 5802727, at *9 (D. Conn. Sept. 7, 2023).  Plaintiffs' claims of discrimination are founded in Defendant's alleged failure to "convene a Section 504 Meeting prior to the start of the 2016-2017 and 2017-2018 school years."  *See* Compl. ¶ 113.   The allegations raised under Count Two revolve heavily around Doe's federal right to access education services, programs, and activities.  *See id.* ¶¶ 116–25.  Moreover, Plaintiffs' factual allegations underpinning the IDEA Claim "are expressly incorporated into their Count Two [Section 504 and ADA claims]."  *R.R.*, 2022 WL 1443979, at *4.  To add, Plaintiffs' prayer for relief notably seeks reimbursement for the tuition cost for Doe.  *See* Compl. 29.  Plaintiffs would not be able to raise these claims against public institutions that are not schools, because such institutions would be obligated to provide Doe with educational services.  Nor could any adult at the school have pressed the same grievance.

Plaintiffs concede that they have not exhausted their Section 504 and ADA Claims. *See* Pls.' Respo. 15–17; *see also* Compl. ¶ 126 (acknowledging the administrative exhaustion requirement for Section 504 and ADA Claims).  Instead, they respond with two, related arguments: first, that Connecticut Hearing Officers lack jurisdiction over Section 504 and ADA claims and, second, that submitting these claims before a Connecticut Hearing Officer would be futile because the claims simply would be dismissed.  Pls.' Resp. 16 & n.12.

Plaintiffs are correct that "[u]nder Connecticut law, an IDEA Hearing Officer's jurisdiction is limited to IDEA claims." *Doe v. Westport Bd. of Educ.*, 609 F. Supp 3d 75, 84 (D. Conn. 2020) (citing Conn. Gen. Stat. § 10-76h(d)).  However, *Doe v. Westport Board of Education* clarified that "[t]here is nothing inconsistent about requiring parties to exhaust IDEA's administrative procedures [for ADA and Section 504 claims] when seeking relief for the denial of a FAPE before bringing Section 504/ADA claims if the Section 504/ADA claims also seek relief for the denial of a FAPE." *Id.*  In other words, even if bringing Section 504 and ADA claims before the IDEA Hearing Officer would have been "futile," doing so nevertheless was a "predicate for a federal court to exercise jurisdiction if the ADA claim was one for which exhaustion was required under section 1415(l)." *R.R.*, 2022 WL 1443979 n.4; *see Cave v. E. Meadow Union Free Sch. Dist.*, 514 F.3d 240, 250 (2d Cir. 2008) (holding that absent certain circumstances, such as "allegations of a system-wide violation of the IDEA mandates," futility does not excuse plaintiffs from "first seek[ing] relief through the administrative review procedures available to them under the IDEA before proceeding with a federal lawsuit").  ███████████

████████████████████████████████████████████████████████████

███████████████████████████ Therefore, because Plaintiffs failed to administratively exhaust their Section 504 and ADA claims, the court lacks jurisdiction to review such claims.

## V.  <u>CONCLUSION</u>

Accordingly, it is thereupon **ORDERED AND ADJUDGED** as follows:

1.  Plaintiffs' motion is granted in part.

    a.  The court finds unreasonable the HO's determination that Defendant "had no obligation to [Doe] under IDEA between October 19, 2015[,] and August 3, 2017," finding that the student's place of residence, not the student's place of enrollment, dictates child-find obligations.  Final Decision and Order 19, ECF No. 1-2.

2.  Defendant's motion is granted in part.

    a.  The court finds reasonable HO's determination that the "events that took place before May 15, 2017[,] are barred by the statute of limitations."

    b.  The court finds reasonable the HO's determination that Defendant "did not deny [Doe] FAPE after May 15, 2017."

3.  The court also finds that Plaintiffs' claims under Section 504 of the Rehabilitation Act and the Americans with Disabilities Act are untimely.

4.  Consistent with this ruling, the parties may file any additional motions for judgment on the administrative record on or before June 30, 2024, or two months from the date of this ruling.  Otherwise, the parties shall file a stipulation of dismissal on or before June 30, 2024.

**IT IS SO ORDERED** in Hartford, Connecticut, this 30th day of April, 2024.

_____/s/_____
OMAR A. WILLIAMS
UNITED STATES DISTRICT JUDGE